**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JIM WANG, ET AL.,<br><br>Plaintiffs,<br><br>vs.<br><br>MASERATI NORTH AMERICA, INC.,<br><br>Defendant. | **Civ. No.: 1:23-CV-02402-KMW-AMD**<br><br>Hon. Karen M. Williams, U.S.D.J.<br>Hon. Anne Marie Donio, U.S.M.J.<br><br>**STATEMENT OF UNDIPSUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT MASERATI NORTH AMERICA, INC'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS' EXPERT NICHOLAS PALUMBO**<br><br>**Motion Return Date: September 16, 2024**<br><br>*Document Filed Electronically*<br><br>**ORAL ARGUMENT REQUESTED** |

Defendant Maserati North America, Inc. ("MNA" or "Defendant"), by and through its undersigned counsel and pursuant to Local Rule 56.1, provides this Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment, and its Motion to Exclude Testimony of Plaintiffs' Expert Nicholas Palumbo.

**GENERAL BACKGROUND**

1.      This action stems from a fire that occurred on December 24, 2021, at a residential property located at 10 Fairway Drive, Voorhees, New Jersey 08043 (the "Property").  (ECF 1, at ¶¶ 9, 12).

2.      Two brothers, Jim and Dean Wang (the "Wangs"), jointly own the Property as tenants in common.  (May 13, 2024 Deposition of Jim Wang, a true and accurate copy of excerpts of which are attached as Exhibit 1, at 9:19-25).

3.    Yu Bai ("Ms. Bai")—Jim and Dean Wang's mother (collectively the "Plaintiffs")—previously owned the Property, and Ms. Bai transferred ownership of the Property to the Wangs in April 2021.  (Ex. 1, at 10:23-11:25).

4.    The Wangs had a homeowner's insurance policy with Allstate, and Ms. Bai's name was the only name on the policy.  (Ex. 1, at 16:17-17:4).

5.    After Ms. Bai transferred ownership of the Property to the Wangs, Plaintiffs rented the Property for the first time to a tenant, Tyrese Maxey.  (May 13, 2024 Deposition of Dean Wang, a true and accurate copy of excerpts of which are attached as Exhibit 2, at 11:10-19).

6.    Mr. Maxey's lease term began on August 13, 2021.  (December 21, 2023 Deposition of Tyrese Maxey, a true and accurate copy of excerpts which are attached as Exhibit 3, at 11:2-13).

7.    Mr. Maxey's uncle, Brandon McKay, lived with Mr. Maxey at the Property.  (Ex. 3, at 10:2-19).

8.    Mr. Maxey had a renter's insurance policy with Travelers Insurance Company.  (December 21, 2023 Deposition of Denise Maxey, a true and accurate copy of excerpts of which are attached as Exhibit 4, at 22:25-23:4-7).

## THE 2018 MASERATI GRANTURISMO

9.    Mr. Maxey and Mr. McKay had two vehicles that they kept in the garage while they resided at the Property: a Range Rover and a Maserati.  (Ex. 3, at 12:16-18).

10.    The Maserati was a 2018 GranTurismo model, VIN ZAM45VLA7J0259456 (the "Vehicle").  (MNA's Answers to Plaintiffs' First Set of Interrogatories, a true and accurate copy of which is attached as Exhibit 5, at 6).

2

11.     According to the Carfax report, the Vehicle was first sold on August 1, 2018, by a Maserati dealership in Louisville, Kentucky.  (June 12, 2024 Report of James Engle, a true and accurate copy of which is attached as Exhibit 6, at 5).

12.     According to the Carfax report, Mr. Maxey purchased the Vehicle on May 21, 2020, in Dallas, Texas.  (Ex. 6, at 5).

13.     After Mr. Maxey purchased the Vehicle, Mr. McKay arranged for it to be transported to New Jersey at the end of Summer 2021.  (February 28, 2024 Deposition of Brandon McKay, a true and accurate copy of excerpts of which are attached as Exhibit 7, at 18:16-19:7).

14.     According to the available maintenance records, the Vehicle had service performed on three occasions.  (Ex. 6, at 5).

15.     First, on April 24, 2019, prior to Mr. Maxey's purchase, the Vehicle's engine control module software was updated, and there were no issues related to safety or fire hazards. (Ex. 6, at 5).

16.     Second, on December 11, 2020, the Vehicle's tire pressure monitoring—which reports when the Vehicle's tire pressure is low—was repaired.  (Ex. 6, at 6).

17.     Third, on August 10, 2021, the Vehicle's network body controller was replaced. (Ex. 6, at 6).

18.     From the time the Vehicle was transported to New Jersey at the end of Summer 2021 until December 24, 2021, Mr. McKay drove the Vehicle "maybe once or twice," and he may have driven the Vehicle "two or three days before" December 24, 2021.  (Ex. 7, at 19:8-14; 21:19-22:13).

19.     Mr. Maxey last drove the Vehicle in September 2021 and does not remember anyone else driving the Vehicle from September to December 24, 2021.  (Ex. 3, at 14:20-15:13).

20.    According to the Camden County Chief Fire Marshal, Joseph P. Hales, Jr., Mr. Maxey's mother, Denise Maxey, reported that the Vehicle was last driven the day before December 24, 2021.  (October 30, 2023 Deposition of Joseph P. Hales, Jr., a true and accurate copy of excerpts of which are attached as Exhibit 8, at 85:17-86:24).

21.    Both Mr. Maxey and Mr. McKay preferred to drive the Range Rover instead of the Vehicle due to the weather and road conditions in Philadelphia and New Jersey at that time of year.  (Ex. 3, at 13:23-14:5; Ex. 7, at 19:8-20:1).

22.    From the time the Vehicle was transported to New Jersey until December 24, 2021, there were no issues with the Vehicle other than having its tires checked one time.  (Ex. 7, at 20:2-21:6).

23.    Both the Vehicle and the Range Rover were insured by Progressive Insurance.  (Ex. 4, at 23:23-24:4).

## **THE FIRE AND OBSERVATIONS OF FIRST RESPONDERS**

24.    On December 24, 2021, Mr. Maxey was hosting his family at the Property for the holidays.  (Ex. 3, at 22:15-17).

25.    That day, Mr. Maxey drove the Range Rover and returned to the Property around 5 o'clock in the evening.  (Ex. 3, at 17:15-22).

26.    Mr. Maxey was the last person to be in the garage that day.  (Ex. 3, at 21:2-7; Ex. 4, at 9:24-10:3).

27.    The Vehicle was parked on the left side of the garage, while the Range Rover was parked on the right side.  (Ex. 8, at 86:25-87:10).

28.    That evening, Mr. Maxey's younger sister smelled smoke, and then Mr. Maxey and his family saw smoke coming from the laundry room area of the Property.  (Ex. 3, at 26:2-11).

29.     A few of Mr. Maxey's family members opened the laundry room door to investigate and saw flames coming from underneath the door that led to the garage.  (Ex. 4, at 16:12-22).

30.     According to Denise Maxey ("Ms. Maxey"), the smoke was white in color.  (Ex. 4, at 18:8-11).

31.     Upon seeing the smoke and flames, Mr. Maxey's family vacated the Property, and Mr. Maxey called 911.  (Ex. 3, at 26:2-14).

32.     Personnel from the Voorhees Fire Department were dispatched at 7:01 p.m., and arrived at the Property at 7:04 p.m.  (Voorhees Fire Department NFIRS Report, a true and accurate copy of which is attached as Exhibit 9, at 1).

33.     The 911 message was relayed to fire departments from neighboring townships, who then sent personnel to assist in extinguishing the fire.  (Ex. 8, at 44:2-19).

34.     Approximately 50 personnel came to the Property, including personnel from South Jersey Gas and Atlantic City Electric.  (Ex. 8, at 44:20-45:3).

35.     Joseph P. Hales, Jr., the Chief Fire Marshal for the Camden County Fire Marshal's Office was among the personnel who responded to the 911 call.  (Ex. 8, at 19:7-20, 41:16-42:8).

36.     Voorhees Fire Official Mike Wharton called Mr. Hales to the scene "[d]ue to the severity of the fire damage."  (Ex. 8, at 45:9-16).

37.     When Mr. Hales "arrived on scene, the garage area was heavily damaged [and] was still smoldering [and] smoking."  (Ex. 8, at 51:6-11).

38.     Fire and emergency personnel were able to get the fire under control at 7:57 p.m. (Ex. 8, at 48:10-19).

39.     The Wangs arrived at the Property after a neighbor informed Jim Wang that the Property was on fire.  (Ex. 1, at 44:12-21).

5

40.     While surveying the entire exterior and interior of the Property, Mr. Hales observed that a bedroom above the garage "was damaged from both fire and fire suppression activities." (Ex. 8, at 51:6-52:2).

41.     Mr. Hales also observed that the area of the Property "immediately inside the garage door . . . sustained . . . fire damage."  (Ex. 8, at 52:3-11).

42.     The last fire unit left the Property at 11:01 p.m.  (Ex. 9, at 1).

43.     The Voorhees Fire Department completed a NFIRS Report that documented its activities and observations at the Property. (Ex. 9).

44.     Under the section titled "D. Ignition," the NFIRS Report provides that the area of origin of the fire was the "vehicle storage area," the heat source of the fire was "undetermined," the item first ignited was "undetermined," and the type of material first ignited was undetermined." (Ex. 9, at 3).

45.     Under the section titled "E1. Cause of Ignition," the NFIRS Report provides that the cause of ignition was "undetermined after investigation."  (Ex. 9, at 3).

46.     And under the section titled "E2. Factors Contributing to Ignition," the Voorhees Fire Department documented that the factors were "undetermined."  (Ex. 9, at 3).

47.     Mr. Hales also completed a "Fire Investigation Report" on behalf of the Camden County Fire Marshal's Office.  (Camden County Fire Marshal's Office Fire Investigation Report, Incident # 2021-12-161-I, a true and accurate copy of which is attached as Exhibit 10).

48.     Mr. Hales reported that "[t]he fire damaged the home and totaled [the Vehicle and Range Rover] inside the garage."  (Ex. 10, at 2).

49.     Mr. Hales conducted his investigation at the Property "while employing a scientific methodology," including *The Basic Methodology of Fire Investigation and a Systematic Approach*

from the National Fire Protection Association's 921: *Guide For Fire and Explosion Investigations* ("NFPA 921").  (Ex. 10, at 1; *See* National Fire Protection Association's 921, *Guide for Fire and Explosion Investigations* (2021 edition), a true and accurate copy of excerpts of which are attached as Exhibit 11).

50.    According to Mr. Hales, NFPA 921 is "a guide in the field of fire science and fire investigation."  (Ex. 8, at 33:24-34:9).

51.    Regarding the area of origin, Mr. Hales determined that the fire originated in the corner on the left side of the garage near the door that can be used to access the Property from the garage.  (Ex. 8, at 70:18-71:16).

52.    In the front left corner of the garage, there were several "common household combustibles" including cardboard boxes and an aluminum ladder.  (Ex. 8, at 79:10-22).

53.    There was also a wood dresser and wood shelf in that area of the garage, both of which sustained significant fire damage.  (June 17, 2024 Report of James Mahaney, a true and accurate copy of which is attached as Exhibit 12, at 10).

54.    Despite his attempts, Mr. Hales could not narrow down the area of origin to a more specific location than the front left corner of the garage.  (Ex. 8, at 71:17-72:9).

55.    As for fuel sources "within the general area of origin," Mr. Hales' "investigation and examination provided insufficient evidence, or information, indicating what the first fuel ignited may have been."  (Ex. 10, at 6).

56.    Ultimately, Mr. Hales developed three working hypotheses for the cause of the fire and explained that there will always be more than one hypothesis when the cause of the fire is undetermined.  (Ex. 8, at 80:1-15).

57. First, Mr. Hales hypothesized that the fire was caused by "[a]n electrical event in the garage igniting immediately available combustibles." (Ex. 10, at 7).

58. Second, Mr. Hales hypothesized that "[a]n event from the Vehicle parked [on the left side] of the garage" caused the fire because the Vehicle "sustained the majority of the fire damage." (Ex. 10, at 7; Ex. 8 at 81:3-12).

59. Third, Mr. Hales hypothesized that a third, undetermined event could have caused the fire. (Ex. 10, at 7; Ex. 8 at 81:13-82:7).

60. Although Mr. Hales was able to eliminate certain potential ignition sources of the fire, he was unable to determine the cause and, therefore, classified it as "undetermined." (Ex. 10, at 6).

61. Mr. Hales could not eliminate the outlets and components of the vehicles as ignition sources because he is "not a[n] electrical engineer, nor a car fire expert." (Ex. 8, at 76:24-77:7).

62. Based on his investigation, Mr. Hales concluded that "the cause of this fire was not determined." (Ex. 10, at 1).

63. Mr. Hales estimates that approximately 60% of investigations result in the cause of a fire being undetermined. (Ex. 8, at 39:18-22).

## THE FIRE'S AFTERMATH

64. After the fire occurred, numerous investigators attended one or both of two inspections that were held "to determine the origin and cause of the fire that occurred on December 24, 2021." (Ex. 12, at 2).

65. First, on February 10, 2022, investigators attended a joint scene inspection at the Property. (February 28, 2024 Deposition of Jeffrey Lange, a true and accurate copy of excerpts of

which are attached as Exhibit 13, at 42:12-43:15; February 10, 2022 Joint Scene Inspection Sign-In Sheet, a true and accurate copy of which is attached as Exhibit 14).

66.     After the joint scene inspection was conducted, "[t]he [Vehicle] was collected on a tow truck." (March 11, 2024 Deposition of Joseph Herzberg, a true and accurate copy of excerpts of which are attached as Exhibit 15, at 34:1-12).

67.     A second inspection occurred on March 25, 2022, when the investigators were able to examine the Vehicle at an off-site location. (Ex. 12, at 2; March 25, 2022 Vehicle Inspection Sign-In Sheet, a true and accurate copy of which is attached as Exhibit 16).

**THE CONCLUSIONS OF INVESTIGATORS RETAINED BY NON-PARTIES**

68.     The Property and its contents were insured by various entities. The Property was insured by a homeowners' policy issued to Ms. Bai by Allstate New Jersey Insurance Company. (May 13, 2024 Deposition of Yu Bai, a true and accurate copy of excerpts of which are attached as Exhibit 17, at 21:12-17; Ex. 1, at 16:17-17:4).

69.     Travelers Insurance issued a renter's insurance policy to Mr. Maxey to cover his personal belongings. (Ex. 4, at 22:25-23:7).

70.     The two vehicles owned by Mr. Maxey were insured by Progressive Insurance Company. (Ex. 4, at 23:23-24:4).

71.     One of the investigators who attended one or both of the inspections, Partick Earley, was retained by Travelers Insurance to "[c]onduct an origin and cause investigation into the fire loss." (February 8, 2024 Deposition of Patrick Earley, a true and accurate copy of excerpts of which are attached as Exhibit 18, at 31:3-7, 34:2-3).

72.     Mr. Earley "investigat[es] fire and explosion incidents in commercial, residential, industrial facilities, automobiles, heavy equipment, equipment and Marine convoys," and considers himself an expert fire investigator.  (Ex. 18, at 17:9-15, 24:11-24).

73.     According to Mr. Earley, NFPA 921 "is the standard guide for fire and explosion investigat[ions]," and he testified that he is unable to determine the cause of a fire 40% of the time. (Ex. 18, at 25:8-13, 28:22-29:16).

74.     During his investigation, Mr. Earley did not identify any potential ignition sources for the fire and he could not determine an area of origin more specific than the garage in general. (Ex. 18, at 40:18-41:23).

75.     Another investigator, Jeffrey Lange, was also retained by Travelers Insurance.  (Ex. 13, at 39:1-6).

76.     Mr. Lange "investigate[s] defects, malfunctions, and other causes of damage in automobiles and vehicles," and considers himself to be an expert in analyzing the origin and cause of a fire "as it relates to the vehicle."  (Ex. 13, at 20:7-14, 30:6-9).

77.     Mr. Lange considers NFPA 921 to be "a guideline" in fire investigations and estimates that the cause of a fire is undetermined in 10 to 20% of his investigations.  (Ex. 13, at 31:12-17, 38:5-12).

78.     During his inspection of the Vehicle, Mr. Lange found that "significant combustibles remain[ed] in the engine compartment" and that there was no indication that fire originated on the underside of the Vehicle or in its engine compartment.  (Ex. 13, at 47:16-48:10, 58:8-59:3).

79.     Allstate Insurance also retained two investigators, one of which was Joseph Herzberg.  (Ex. 15, at 41:3-15).

80.    Mr. Herzberg is a "[f]ire and explosion investigator" and considers himself to be an expert in vehicle fires.  (Ex. 15, at 10:11-22, 20:13-16).

81.    Mr. Herzberg considers NFPA 921 to be "a guideline for fire investigators" and estimates that 50% of his investigations result in the cause of a fire being undetermined.  (Ex. 15, at 21:24-22:4, 25:16-25).

82.    Roger Iapicco, a fire investigator, was also retained by Allstate Insurance to "[i]dentify the origin and cause of the fire."  (March 11, 2024 Deposition of Roger Iapicco, a true and accurate copy of excerpts of which are attached as Exhibit 19, at 16:18-23, 28:11-19).

83.    Because he does not consider himself to be an expert in vehicle fires specifically, Mr. Iapicco worked together with Mr. Herzberg on this case.  (Ex. 19, at 27:17-25, 44:20-25).

84.    Mr. Iapicco considers NFPA 921 to be an "authoritative document" in the field of fire science and investigation and estimates that 25% of his investigations end with the cause of a fire being undetermined.  (Ex. 19, at 23:22-24:1, 26:23-27:10).

85.    Mr. Iapicco wrote in his report relating to the investigation of the fire that is the subject of this case that the "[Vehicle] has been eliminated as the cause of the fire" and testified that Mr. Herzberg provided him that information.  (Ex. 19, at 57:3-9).

86.    Another investigator, Jonathan Costa, was retained by Progressive Insurance to "try to determine the origin and the cause of the fire."  (January 26, 2024 Deposition of Jonathan Costa, a true and accurate copy of excerpts of which are attached as Exhibit 20, at 49:20-50:4).

87.    Mr. Costa is an "automotive fire investigator and mechanical expert" and considers himself to be an expert in determining the cause and origin of fires in vehicles.  (Ex. 20, at 25:8-20, 36:10-16).

88.     Mr. Costa believes NFPA 921 is a guide in the field of fire investigation.  (Ex. 20, at 36:25-37:6).

89.     After his investigation in this case, Mr. Costa concluded that "the actual ignition source of the cause of the fire was undetermined" but "burn patterns" and "component damage variables incurred to the [V]ehicle would indicate that the fire extended into the front of the [V]ehicle."  (Ex. 20, at 66:7-17).

90.     In other words, Mr. Costa concluded that the fire "did not start in the [V]ehicle" because the burn patterns on the Vehicle were "not consistent with the fire originating within the vehicle."  (Ex. 20, at 67:3-8, 86:7-87:12).

## THE OPINIONS OF PLAINTIFFS' EXPERT, NICHOLAS PALUMBO

91.     In addition to the investigators retained by non-parties, Plaintiffs retained and designated as an expert, Nicholas Palumbo as a person having "knowledge of the cause and origin of the fire."  (Plaintiffs' July 30, 2023 Initial Disclosures, a true and accurate copy of which is attached as Exhibit 21, at 2).

92.     Mr. Palumbo is a recently retired fire investigator and a former fireman.  (July 2, 2024 Deposition of Nicholas Palumbo, a true and accurate copy of which is attached as Exhibit 22, at 7:16-23; 8:22-9:1).

93.     As for his education, Mr. Palumbo has "a bachelor's degree in fire and emergency service management and a master's [in] fire and emergency service administration."  (Ex. 22, at 17:5-9).

94.     He also holds a certification as a fire and explosions investigator. (Ex. 22, at 19:19-24).

95.     During his time as an investigator, "[w]ell over 90 percent of [Mr. Palumbo's] work was fire and explosions investigations for attorneys and insurance carriers." (Ex. 22, at 22:13-20).

96.     Despite knowing that there are certifications offered specifically for fire investigations involving vehicles, Mr. Palumbo never obtained those certifications. (Ex. 22, at 21:7-22).

97.     Moreover, Mr. Palumbo does not have a degree or any training in engineering, including mechanical, electrical, and automotive engineering, he has never worked for a vehicle manufacturer, he has no experience in designing automobiles or designing, testing, or inspecting component parts of automobiles, and he has never been designated or testified as an expert in either mechanical or automotive engineering. (Ex. 22, at 24:4-25:24).

98.     When he was contacted to work on this case, Mr. Palumbo was asked "[t]o determine what caused the fire." (Ex. 22, at 33:24-34:1).

99.     Mr. Palumbo described his methodology regarding his inspection of the Vehicle at the Property on February 10, 2022 as follows: "[w]orked our way from around the vehicle toward the vehicle. The leas[t] burned or less burned to the most intense burn." (Ex. 22, at 60:2-20).

100.     And for the March 25, 2022 inspection, Mr. Palumbo testified that "[w]e followed the basic force course [sic] that we usually do; inspect [the Vehicle] up close, document it photographically." (Ex. 22, at 60:21-61:6).

101.     Like the other investigators mentioned above, Mr. Palumbo is familiar with NFPA 921, and called it "a guide [for] fire and explosions investigations," and agreed that it is the generally accepted methodology within the field of fire investigations. (Ex. 22, at 61:7-62:2).

102.     Specifically, Mr. Palumbo testified that he is familiar with Section 18.2 of NFPA 921 that describes the overall methodology used in determining the origin of a fire, Section

18.2.1.1 that describes the purpose of a fire spread analysis, and Section 4.3.10 that describes how to handle confirmation bias when analyzing a fire, and he agreed that these sections describe generally accepted methodologies.  (Ex. 22, at 62:3-64:18, 96:13-97:14).

103.    Moreover, Mr. Palumbo testified that a conclusion that relies only on data in support of one hypothesis without considering alternative hypotheses is improper under NFPA 921's generally accepted methodology.  (Ex. 22, at 97:15-20).

104.    Mr. Palumbo explained further that, pursuant to NFPA 921's generally accepted methodology, the first step in a fire investigation is to determine the origin of the fire, and only if an origin is determined, can the fire's cause then be analyzed.  (Ex. 22, at 65:23-66:5).

105.    However, Mr. Palumbo estimated that likely more than 50% of fires result in the cause being undetermined.  (Ex. 22, at 66:6-9).

106.    Mr. Palumbo also agreed that, pursuant to NFPA 921, a proper fire investigation will consider all evidence and data that is relevant to the determination of the origin and cause of a fire.  (Ex. 22, at 102:16-20).

107.    This evidence includes information from the residents of a house where a fire occurs and their deposition testimony, and Mr. Palumbo testified that he "can't think of a time when" information from residents would not be relevant to his opinions as a fire investigator.  (Ex. 22, at 48:5-49:23).

108.    Mr. Palumbo also testified that the data of other investigators who inspect the evidence and who have expertise in areas beyond his own is relevant to the determination and the origin and cause of a fire.  (Ex. 22, at 102:10-24).

109.    He even admitted that "[i]f you're not an expert in a given field, referring to other experts who are experts in that field would be a good thing."  (Ex. 22, at 56:22-57:3).

110.    It is Mr. Palumbo's opinion that, while "the cause of the fire cannot be determined, . . . the cause of the fire being a malfunction in the 2018 Maserati GranTurismo cannot be ruled out[,]" and "that the origin of the fire was in the engine compartment of the 2018 Maserati GranTurismo vehicle." (May 17, 2024 Report of Nicholas Palumbo, a true and accurate copy of which is attached as Exhibit 23, at 4; Ex. 22, at 95:2-96:7, 98:5-7).

111.    During his investigation, Mr. Palumbo developed an initial hypothesis: "based upon the damage to the [V]ehicle versus the surrounding areas, that the [V]ehicle was the most intense burn, which in my opinion would be the most prolonged burning." (Ex. 22, at 64:16-65:1).

112.    To support his opinion, Mr. Palumbo stated only that "[t]he hood was consumed" and there was "heavy damage to the interior of the engine compartment." (Ex. 22, at 70:25-71:18).

113.    Because the hood of the Vehicle was consumed, Mr. Palumbo opined that "there had to be a fire within the engine compartment and it had to burn for a while." (Ex. 22, at 70:14-20).

114.    When asked about burn patterns to the engine compartment specifically, Mr. Palumbo stated only that the "[h]eaviest burn [was] in the front of the engine compartment versus the rear of the compartment." (Ex. 22, at 86:11-19).

115.    As for how long the fire burned in the engine compartment, Mr. Palumbo opined that the fire would have had to burn in the engine compartment for "at least a good 15 minutes" to inflict the damage that was done, and that fire investigators "always" consider the amount of time a fire burned in their origin and cause analysis. (Ex. 22, at 72:12-21, 74:5-13).

116.    Yet, Mr. Palumbo simply answered "I can't tell you" when asked how long this specific fire burned, despite admitting that the Voorhees Fire Department Report contained

information on what time the department received the call and when the fire was contained.  (Ex. 22, at 72:22-76:5).

117.    The Voorhees Fire Department was alarmed at 7:01 p.m. and arrived at the Property at 7:04 p.m., and "[t]he fire went under control at [7:57 p.m.]"  (Ex. 9, at 1; Ex. 8, at 48:19).

118.    Despite his reliance on the fact that the hood was consumed and the heavy damage to the engine compartment to place the origin of the fire in the engine compartment, Mr. Palumbo agreed that NFPA 921 establishes that fires that start external to a vehicle may spread to the vehicle and cause it to sustain significant damage.  (Ex. 22, at 67:16-70:13, 96:8-12).

119.    Moreover, Mr. Palumbo eliminated the Vehicle's trunk as the fire's origin due to "the lack of fire damage," yet the trunk cover, like the hood, was also consumed in the fire—"[i]t was gone."  (Ex. 22, at 83:18-84:14).

120.    Mr. Palumbo stated that the trunk cover is made of fiberglass, which "is going to burn a little easier than metal will."  (Ex. 22, at 84:2-17).

121.    Mr. Palumbo also answered "[y]es" when asked, if the fire had originated in the engine compartment, would it have burned until all of the combustible material in the compartment was consumed.  (Ex. 22, at 76:6-10).

122.    However, Mr. Palumbo acknowledged that some combustible materials still remained in the engine compartment, and that the remaining combustibles could support a hypothesis that the fire originated external to the engine compartment of the Vehicle.  (Ex. 22, at 76:11-14, 77:19-78:4).

123.    When asked how the heat from the fire "was sufficient to destroy the hood but not the combustible components underneath the hood," Mr. Palumbo answered that the fire "didn't

contact [the combustible components] long enough to destroy them," and he based this opinion on "[t]he physical fire damage." (Ex. 22, at 81:15-82:7).

124.   In addition, when Mr. Palumbo was asked if he considered a hypothesis that the combustibles in the engine compartment were not destroyed because they were protected by the hood from a fire that originated external to the Vehicle, and if he "consider[ed] any facts to support or disprove a hypothesis that the hood cover was consumed from a heat source external to the engine compartment," he answered: "We thought about it.  Given the fact that it was a metal, it would need to have a fire underneath for a period of time to consume it.  The fire above it would . . . stay above it." (Ex. 22, at 86:2-87:10).

125.   Mr. Palumbo also testified that white smoke is "normally not consistent with" the burning of plastic components within the engine compartment of a vehicle. (Ex. 22, at 136:18-22).

126.   Furthermore, when he authored his report, Mr. Palumbo reviewed the Voorhees Fire Department NFIRS Report, the Camden County Fire Marshal's Office Fire Investigation Report, photographs from the Property and Vehicle inspections, and his observations from those inspections. (Ex. 23, at 2).

127.   Mr. Palumbo reviewed only these materials because they were the only ones provided to him, and he did not request any other materials to review. (Ex. 22, at 51:18-52:5).

128.   He did not speak with any of the Property's residents, and he admitted that he was unaware that the residents had been deposed. (Ex. 22, at 48:5-50:2).

129.   As a result, Mr. Palumbo believed that the Vehicle was used the afternoon of the fire, and he did not know that Mr. Maxey testified that the Vehicle had not been driven in months,

or that Mr. McKay testified that it had not been driven in at least two days at the time of the fire, which Mr. Palumbo admitted "might be" relevant to his opinions.  (Ex. 22, at 111:12-112:23).

130.    In addition, Mr. Palumbo admitted that he does not have the requisite expertise to opine as to the cause of fires involving vehicles.  (Ex. 22, at 123:21-24).

131.    In fact, he worked on this case with Mike Zazula, an automotive engineer who was brought in to assist Mr. Palumbo due to Mr. Zazula's specific expertise regarding vehicle fires. (Ex. 22, at 88:14-89:7, 123:16-24).

132.    Mr. Palumbo testified that Mr. Zazula informed him that the Vehicle's trunk cover was made of fiberglass, yet Mr. Palumbo does not know where Mr. Zazula got this information from, and Mr. Palumbo also did not see any source materials describing the composition of either the trunk cover or the hood cover.  (Ex. 22, at 84:21-86:1).

133.    According to Mr. Palumbo, Mr. Zazula told him that he could not provide an opinion regarding the cause of the fire.  (Ex. 22, at 124:9-19).

134.    Plaintiffs did not designate Mr. Zazula as an expert in this case.  (Ex. 22, at 124:23-125:8; *See* Ex. 21).

135.    Despite his lack of expertise in vehicle fires specifically, Mr. Palumbo did not review or consider the data or opinions of other fire investigators—the investigators who testified that NFPA 921 is a generally accepted methodology for fire investigations—in reaching his opinions and authoring his report.  (Ex. 23, at 2; Ex. 22, at 102:25-103:5).

136.    Mr. Palumbo was aware that there were other investigators who inspected the evidence related to this fire.  (Ex. 22, at 101:5-8).

137. When confronted with the other fire investigators' reports that eliminated the Vehicle as the origin or cause of the fire, Mr. Palumbo disagreed: "I still feel that the vehicle was involved somehow." (Ex. 22, at 108:5-109:16, 116:11-118:24).

138. Mr. Palumbo, however, did review the reports of MNA's experts, James Mahaney and James Engle. (Ex. 22, at 99:9-14, 100:14-18).

139. Mr. Palumbo admitted that Mr. Mahaney's "conclusions were the same as mine, the fire was undetermined," and that he did not disagree with anything in Mr. Engle's report. (Ex. 22, at 99:9-101:4).

140. Ultimately, Mr. Palumbo did not determine any of the following: the first fuel to ignite the fire, the ignition source of the fire, nor the ignition sequence of the fire. (Ex. 22, at 97:21-98:4).

141. Moreover, Mr. Palumbo testified that he does not have an opinion as to the cause of the fire, any potential design defect in the Vehicle, any alternative design to any design defect in the Vehicle, any potential manufacturing defect in the Vehicle, or any failure of MNA to provide a warning with the Vehicle, and that he does not have the required expertise to do so. (Ex. 22, at 98:5-99:6).

## THE OPINIONS OF DEFENDANTS' EXPERTS

142. MNA retained two experts of its own, including James Mahaney, a fire investigator whose job is to determine the origin and cause of fires. (July 18, 2024 Deposition of James Mahaney, a true and accurate copy of which is attached as Exhibit 24, at 14:5-10).

143. Mr. Mahaney has conducted approximately 650 fire investigations generally in the last 8 years alone—after investigating fires for almost twenty years with the New York City Fire

Department—including approximately seventy-five to one hundred fire investigations involving vehicles. (Ex. 24, at 6:14-25, 16:1-7, errata form; Ex. 12, at Exhibit 1).

144.  As part of his prior experience, Mr. Mahaney took classes involving learning while actually lighting vehicles on fire. (Ex. 24, at 9:23-10:15).

145.  Mr. Mahaney defined a fire's origin as "the area in which the fire is determined to have originated," and he defined a fire's cause as "what caused the fire in that area of origin." (Ex. 24, at 44:3-11).

146.  Therefore, origin and cause are distinct concepts, and Mr. Mahaney made clear that "you have to have an origin before you can come up with a cause," and not vice versa. (Ex. 24, at 44:11-45:11).

147.  To conduct his investigation for this case, Mr. Mahaney followed NFPA 921's generally accepted methodology. (Ex. 24, at 22:15-19).

148.  Mr. Mahaney described the generally accepted methodology for analyzing the origin of a fire: "working from the exterior first, from least amount of damage to the most amount of damage, to the interior from the least amount of damage to the most amount of damage, and narrowing your area of origin . . . to a specific area . . . by following the burn patterns, soot and staining and smoke staining patterns . . . from the least damage to the most damage, which leads you usually to the area of origin." (Ex. 24, at 45:12-46:7).

149.  Mr. Mahaney explained further that an investigator has to develop multiple hypotheses and try to disprove each one, and that "[i]nterviews, fire damage, the amount of damage, what is damaged, [and] where the damage is" are the types of information that are relevant to an origin analysis. (Ex. 24, at 46:25-48:22).

150. When asked if it is important to consider all of the available facts as part of his analysis, Mr. Mahaney answered "[a]bsolutely," and that it is even more important to consider facts that "tend to disprove a hypothes[i]s." (Ex. 24, at 48:23-49:5).

151. Mr. Mahaney also described the generally accepted methodology for analyzing the cause of a fire: "analyze the data given [and] . . . come up with a hypothes[i]s [and then] try to eliminate them one by one." (Ex. 24, at 49:6-22).

152. He also explained that NFPA 921 defines the circumstance under which the cause of a fire should be classified as undetermined, which is "when you have less than 50 percent of probability that one specific hypothesis is the cause of the fire." (Ex. 24, at 49:23-50:6).

153. According to Mr. Mahaney, the cause of a fire is undetermined approximately 60 to 70 percent of the time in his vehicle fire investigations. (Ex. 24, at 16:8-13, errata form).

154. Moreover, Mr. Mahaney explained that potential causes of a fire can still be ruled out when the fire is classified as undetermined by using inductive reasoning. (Ex. 24, at 50:7-16).

155. Facts relevant to Mr. Mahaney's determination of the cause of a fire are the "area of origin, [and] what's in my area of origin that could have caused a fire," including things such as electrical wiring. (Ex. 24, at 50:17-51:9).

156. As with his origin analysis, Mr. Mahaney stressed the importance of considering all available facts to analyze potential causes, including the facts that tend to disprove a hypothesis. (Ex. 24, at 51:10-18).

157. Ultimately, Mr. Mahaney testified that it is important to follow the generally accepted methodology, or "scientific method," because it is "a systematic approach," and if the systematic approach is not followed, you cannot get reliable results. (Ex. 24, at 42:14-44:2).

158.    In this case, Mr. Mahaney determined "that the fire originated in the area in front of the [Vehicle] against the wall at floor level."  (Ex. 24, at 24:14-20).

159.    In that area, there was remnants of burnt material, electrical wires, and an aluminum ladder that had melted.  (Ex. 24, at 25:18-26:3).

160.    There was also a "V pattern on the wall . . . where the melted ladder was" and appeared to be the area with the longest and hottest burning, or, in other words, where the fire burned most intensely, which is where the origin usually is located.  (Ex. 24, at 32:3-15).

161.    Despite narrowing down the area of origin, Mr. Mahaney could not determine the cause of the fire.  (Ex. 24, at 31:8-12).

162.    However, Mr. Mahaney hypothesized multiple possible causes, including an outlet right above the area of origin on the wall, and unknown electrical wires.  (Ex. 24, at 26:24-27:18).

163.    Mr. Mahaney also explained that the evidence that the color of the smoke from the fire was white is indicative of natural objects being burnt, while products "like plastics and rubbers and the wiring in the [Vehicle's] engine" would result in a "darker, sootier smoke."  (Ex. 24, at 35:25-37:8).

164.    Moreover, Mr. Mahaney testified that if the Vehicle was not driven recently, then that makes it less likely for the fire to have originated in the Vehicle, and that a wooden shelf along the wall above the outlet which Mr. Mahaney deemed to be the area of origin indicated that the fire originated below the shelf.  (Ex. 24, at 37:9-39:19).

165.    In addition, Mr. Mahaney described how the burn patterns on the passenger quarter panel were inconsistent with the origin being inside the Vehicle, and that the amount of combustibles remaining in the engine compartment were too numerous to say "that the fire originated in the engine compartment."  (Ex. 24, at 35:9-24, 40:25-42:6).

166.    Mr. Mahaney also provided an explanation for how a fire originating on the wall in front of the Vehicle could get to and ignite the hood. (Ex. 24, at 34:9-35:4).

167.    Finally, Mr. Mahaney explained that Mr. Palumbo did not follow the generally accepted methodology because "[he] basically said [the origin] is under the hood because the hood was consumed and it is there because that's where I said it is." (Ex. 24, at 53:6-54:7).

168.    Mr. Mahaney testified that another reason Mr. Palumbo was incorrect to place the origin in the Vehicle's engine compartment is because if Mr. Palumbo can say that the aluminum hood of the Vehicle "is the area of origin because it melted then why isn't the aluminum ladder not the area of origin because it melted, also." (Ex. 24, at 33:11-34:4).

169.    MNA also retained James Engle to "try to determine the fire origin and cause." (July 18, 2024 Deposition of James Engle, a true and accurate copy of which is attached as Exhibit 25, at 16:7-9).

170.    Mr. Engle investigated fires for Ford Motor Company from 2002 to 2021 and has been tasked with determining the origin and cause of a fire "hundreds, if not thousands" of times. (Ex. 25, at 10:21-11:11; Ex. 6, at Exhibit 1).

171.    In Mr. Engle's experience, the cause of a fire is undetermined "about 50 percent of the time." (Ex. 25, at 12:2-12).

172.    As a fire investigator, Mr. Engle testified that he is required to follow a generally accepted methodology in analyzing the origin and cause of a fire specifically when a vehicle is involved, and he explained that it is "just following the scientific method. You would gather data, analyze the data, form a hypothesis, test the hypothesis. And if your test was successful, then you would form a conclusion. If your test is unsuccessful, then you go back, reanalyze, gather more data, and go through the process again." (Ex. 25, at 46:10-23).

173.    According to Mr. Engle, failing to follow this methodology will not permit an investigator to reach reliable conclusions.  (Ex. 25, at 46:24-47:7).

174.    Mr. Engle explained that the generally accepted methodology defines the concepts of origin and cause "within the NFPA 921," and that "you can have an origin without a cause, but you can't have a cause without an origin."  (Ex. 25, at 47:8-48:6).

175.    Like Mr. Mahaney, Mr. Engle explained the importance of developing and testing multiple hypotheses when analyzing a fire's origin, and that all available facts must be considered, including the facts that tend to disprove a hypothesis because if a hypothesis cannot be explained, then that "theory doesn't work."  (Ex. 25, at 48:7-50:16).

176.    And, again like Mr. Mahaney, Mr. Engle testified that, pursuant to NFPA 921, a fire is undetermined if a "competent ignition source within your area of origin" cannot be identified, and that potential causes of a fire can still be ruled out if a fire is classified as undetermined.  (Ex. 25, at 50:17-51:7).

177.    As for Mr. Engle's generally accepted methodology for analyzing the cause of a fire, he explained that it is important to consider all available facts and "be able to explain why they do or do not affect your theory."  (Ex. 25, at 51:8-21).

178.    In this case, Mr. Engle concluded that the fire originated "[e]xternal to the [V]ehicle."  (Ex. 25, at 23:25-24:17).

179.    Mr. Engle observed that most of the burning was in the "very front of the [V]ehicle . . . [o]n the bumper fascia and grille," while "[t]here are still way too many combustibles left . . . all over the engine compartment that should have been consumed if the fire was to originate in the engine compartment."  (Ex. 25, at 27:21-28:17).

180.    As further evidence to eliminate the engine compartment as the origin of the fire, Mr. Engle pointed to damage to the left rear tire as exhibiting that the fire burned from outside the Vehicle, the lack of paint remaining on the left side of the vehicle, and that the intake manifold and battery junction box in the engine compartment suffered relatively little damage.  (Ex. 25, at 30:11-21, 33:6-23, 43:1-44:11).

181.    Mr. Engle also relied on the fact that the interior of the Vehicle was "not that badly damaged" because, if the fire originated in the Vehicle, the "seats would burn pretty quickly," and there was a lot of combustibles left in both the "front instrument panel" and in "the passenger compartment."  (Ex. 25, at 40:5-7, 42:5-24).

182.    Moreover, because the trunk hood lid ignited and burned, Mr. Engle testified that "both the front and rear experience very, very high temperatures," even if the trunk's melting point was lower than the hood's.  (Ex. 25, at 19:2-22:7).

183.    In addition, Mr. Engle agreed with Mr. Mahaney and explained that white smoke is "not consistent with an engine compartment fire" because "[i]f the fire was in the engine compartment, it would produce black acrid smoke, very thick black smoke."  (Ex. 25, at 37:11-39:17).

184.    Ultimately, Mr. Engle testified that Mr. Palumbo did not follow the generally accepted methodology in reaching his origin conclusion because "his theory was that the aluminum hood melted so the fire must have been in the engine compartment.  But he didn't consider the other data available including the amount of combustibles left within the engine compartment and the fact that this [V]ehicle was exposed to high external temperatures that would have melted the hood from the outside in."  (Ex. 25, at 52:18-53:5).

185.    In other words, according to Mr. Engle, "Mr. Palumbo basically says the fire started in the engine compartment because the hood was melted.  Well, there's lots of reasons why the hood melted.  It doesn't mean the fire started in the engine compartment.  This is a vehicle that was in an oven."  (Ex. 25, at 22:18-22).

## THE INSTANT ACTION

186.    Plaintiffs filed their Complaint in this Court on May 1, 2023, and allege that "the fire originated in the engine compartment of the Maserati Vehicle," and that "[t]he fire was caused by a defect in the Maserati Vehicle."  (ECF 1 at ¶¶ 19-20).

187.    The Complaint asserts four counts against Defendant, including Strict Liability – Design Defect (Count I); Strict Liability – Manufacturing Defect (Count II); Failure to Warn (Count III), and Negligence (Count IV).  (*See generally* ECF 1 at ¶¶ 22-43).

Respectfully submitted,

*/s/ Kevin J. Penhallegon*

Kevin J. Penhallegon, Esq. (#038602012)
Tiffany M. Alexander, Esq. (#000692002)
Elyse N. Cohen, Esq. (#155212015)
NELSON MULLINS RILEY & SCARBOROUGH LLP
1000 Westlakes Drive, Suite 275
Berwyn, PA 19312
Phone: (443) 392-9417
kevin.penhallegon@nelsonmullins.com

***Attorneys for Defendant,
Maserati North America, Inc.***

26

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 23rd Day of August, 2024, a copy of Defendant Maserati North America, Inc.'s Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment and Motion to Exclude Testimony of Plaintiffs' Expert Nicholas Palumbo, Certification of Kevin J. Penhallegon, Esq., and supporting exhibits were electronically filed via CM/ECF and served on all counsel of record, pursuant to the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of New Jersey.

Date: August 23, 2024                              */s/ Kevin J. Penhallegon*
                                                            Kevin J. Penhallegon, Esq. (#038602012)