<u>**NOT FOR PUBLICATION**</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| JIM WANG, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MASERATI NORTH AMERICA, INC., *et al.*,<br><br>Defendants. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br>No. 23-2402 (KMW-AMD)<br><br>**OPINION** |

APPEARANCES:

JEFFREY P. RESNICK, ESQ.
LANIQUE A. ROBERTS, ESQ.
308 HARPER DRIVE, SUITE 200
MOORESTOWN, NJ 08057

    *Counsel for Plaintiffs Jim Wang, Dean Wang, and Yu Bai*

KEVIN J. PENHALLEGON, ESQ.
TIFFANY M. ALEXANDER, ESQ.
ELYSE N. COHEN, ESQ.
NELSON MULLINS RILEY & SCARBOROUGH LLP
1000 WESTLAKES DRIVE, SUITE 275
BERWYN, PA 19312

    *Counsel for Defendant Maserati North America, Inc.*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

Plaintiffs Jim Wang, Dean Wang, and Yu Bai ("Plaintiffs") bring this product liability action against Defendant Maserati North America, Inc. ("Defendant"). Plaintiffs' Complaint alleges that a fire at Plaintiffs' residential property ("Property") was caused by a 2018 Maserati GranTurismo VIN ZAM45VLA7J0259456 ("Vehicle") owned by their tenant that was parked in the garage at the time of the fire. (Compl., ECF No. 1.) The Complaint alleges causes of action under the New Jersey Products Liability Act for a design defect, manufacturing defect, and failure to warn, as well as a claim for negligence. (*Id.*)

This matter comes before the Court on Defendant's Motion to Exclude Plaintiffs' Expert Opinion Testimony (ECF No. 40) and Defendant's Motion for Summary Judgment (ECF No. 41). Plaintiffs oppose both motions, (ECF Nos. 44, 51), and Defendant replied (ECF Nos. 50, 52). For the reasons that follow, Defendant's Motion to Exclude (ECF No. 40) is **GRANTED** in part, and Defendant's Motion for Summary Judgment (ECF No. 41) is **GRANTED**.[1]

## II.    BACKGROUND

### A.    The Underlying Incident

This action stems from a fire that occurred on December 24, 2021, at a residential property located at 10 Fairway Drive, Voorhees, New Jersey 08043 (the "Property"). (Defendant's Statement of Undisputed Material Facts ("SUMF") ¶ 1.) Two brothers, Jim and Dean Wang (the "Wangs"), jointly own the Property as tenants in common.[2] (*Id.* ¶ 2.) The Wangs rented the Property to a tenant, Tyrese Maxey, whose lease term began on August 13, 2021. (*Id.* ¶¶ 5-6.)

---

[1] Pursuant to Local Civil Rule 78.1(b), this motion will be decided on the papers without oral argument.

[2] Yu Bai ("Bai," collectively with the Wangs, "Plaintiffs")—the Wangs' mother—previously owned the Property, and Bai transferred ownership of the Property to the Wangs in April 2021. (SUMF ¶ 3 (citing Ex. 1, at 10:23-11:25.))

Maxey's uncle, Brandon McKay, lived with Maxey at the Property. (*Id.* ¶ 7.) Maxey and McKay had two vehicles that they kept in the garage while they resided at the Property: a Range Rover and a Maserati. (*Id.* ¶ 9.) The Maserati was a 2018 GranTurismo model, VIN ZAM45VLA7J0259456 (the "Vehicle"). (*Id.* ¶ 10.) Maxey purchased the Vehicle on May 21, 2020, in Dallas, Texas. (*Id.* ¶ 12.) After Maxey purchased the Vehicle, McKay arranged for it to be transported to New Jersey at the end of Summer 2021. (*Id.* ¶ 13.) According to the available maintenance records, the Vehicle had service performed on three occasions. (*Id.* ¶ 14.) First, on April 24, 2019, prior to Maxey's purchase, the Vehicle's engine control module software was updated, and there were no issues related to safety or fire hazards. (*Id.* ¶ 15.) Second, on December 11, 2020, the Vehicle's tire pressure monitoring—which reports when the Vehicle's tire pressure is low—was repaired. (*Id.* ¶ 16.) Third, on August 10, 2021, the Vehicle's network body controller was replaced, (*id.* ¶ 17), following the display of multiple warnings on the instrument cluster. (Plaintiff's Response to Defendant's SUMF ("RSUMF") ¶ 17.)

Maxey testified that he last drove the Vehicle in September 2021 and does not remember anyone else driving the Vehicle from September to December 24, 2021, though he noted that McKay would sometimes take the vehicle for maintenance.[3] (SUMF ¶ 19; RSUMF ¶ 19.) McKay testified that from the time the Vehicle was transported to New Jersey at the end of Summer 2021 until December 24, 2021, he drove the Vehicle "maybe once or twice," and he may have driven the Vehicle "two or three days before" December 24, 2021. (SUMF ¶ 18.) According to the Camden County Chief Fire Marshal, Joseph P. Hales, Jr., Maxey's mother reported that the Vehicle was last driven the day before December 24, 2021. (*Id.* ¶ 20.)

On December 24, 2021, Maxey was hosting his family at the Property for the holidays. (*Id.*

---

[3] Both Maxey and McKay preferred to drive the Range Rover instead of the Vehicle due to the weather and road conditions in Philadelphia and New Jersey at that time of year. (SUMF ¶ 21.)

¶ 24.) That day, Maxey drove the Range Rover and returned to the Property around 5:00 p.m. (*Id.* ¶ 25.) Maxey was the last person in the garage that day. (*Id.* ¶ 26.) That night, Maxey's sister smelled smoke, and then Maxey and his family saw smoke coming from the laundry room area of the Property. (*Id.* ¶ 28.) Maxey's family members opened the laundry room door to investigate and saw flames coming from underneath the door that led to the garage. (*Id.* ¶ 29.) Upon seeing the smoke and flames, Maxey's family vacated the Property, and Maxey called 911. (*Id.* ¶ 31.)

Approximately 50 personnel responded to the 911 message, including the Voorhees Fire Department, fire departments from neighboring townships, and South Jersey Gas and Atlantic City Electric. (*Id.* ¶¶ 32-34.) Due to the severity of the fire damage, Voorhees Fire Official Mike Wharton called the Camden County Fire Marshal's Office to the scene. (*Id.* ¶¶ 35-36.) When Chief Fire Marshal Hales "arrived on scene, the garage area was heavily damaged [and] was still smoldering [and] smoking." (*Id.* ¶ 37.) The Voorhees Fire Department completed a NFIRS Report that documented its activities and observations at the Property. (*Id.* ¶ 43.) Under the section titled "D. Ignition," the NFIRS Report provides that the area of origin of the fire was the "vehicle storage area," the heat source of the fire was "undetermined," the item first ignited was "undetermined," and the type of material first ignited was undetermined." (*Id.* ¶ 44.) Under the section titled "E1. Cause of Ignition," the NFIRS Report provides that the cause of ignition was "undetermined after investigation." (*Id.* ¶ 45.) Under the section titled "E2. Factors Contributing to Ignition," the Voorhees Fire Department documented that the factors were "undetermined." (*Id.* ¶ 46.)

Hales also completed a "Fire Investigation Report" on behalf of the Camden County Fire Marshal's Office, which reported that "[t]he fire damaged the home and totaled [the Vehicle and Range Rover] inside the garage." (*Id.* ¶¶ 47-48.) Hales conducted his investigation at the Property "while employing a scientific methodology," including The Basic Methodology of Fire

4

Investigation and a Systematic Approach from the National Fire Protection Association's 921: Guide For Fire and Explosion Investigations ("NFPA 921"). (*Id.* ¶ 49.) Hales determined that the fire originated in the left corner of the garage, in an area with "common household combustibles" including cardboard boxes and an aluminum ladder. (*Id.* ¶¶ 51-52.) Hales could not eliminate the outlets and components of the vehicles as ignition sources because he is "not a[n] electrical engineer, nor a car fire expert." (*Id.* ¶ 61 (citing Ex. 8, at 76:24-77:7.)) Based on his investigation, Hales concluded that "the cause of this fire was not determined." (*Id.* ¶ 62 (citing Ex. 10 at 1.))

### B. Non-Party Fire Investigators

The Property and vehicles in the garage were insured by various entities, which each retained fire investigators. (*Id.* ¶ 68-70.) Travelers Insurance retained Partick Earley to "[c]onduct an origin and cause investigation into the fire loss." (*Id.* ¶ 71.) Earley did not identify any potential ignition sources for the fire, and he could not determine an area of origin more specific than the garage in general. (*Id.* ¶ 71 (citing Ex. 18 at 40:18-41:23.)) Travelers also retained Jeffrey Lange, who "investigate[s] defects, malfunctions, and other causes of damage in automobiles and vehicles," and considers himself an expert in inspecting the origin and cause of a fire as it relates to vehicles. (*Id.* ¶ 76 (quoting Ex. 13 at 20:7-14, 30:6-9.)) Lange found that "significant combustibles remain[ed] in the engine compartment" and concluded that there was no indication that fire originated on the underside of the Vehicle or in its engine compartment.[4] (*Id.* ¶ 78 (citing Ex. 13, at 47:16-48:10, 58:8-59:3.))

Allstate Insurance also retained two investigators, Joseph Herzberg and Roger Iapicco, to "[i]dentify the origin and cause of the fire." (*Id.* ¶ 79-82 (citing Ex. 19 at 16:18-23, 28:11-19.)) Iapicco wrote a report on his investigation which opined that the Vehicle "has been eliminated as

---

[4] Earley and Lange agreed that NFPA 921 is an applicable guideline for conducting fire investigations. (SUMF ¶ 73, 77.)

the cause of the fire." (*Id.* ¶ 85.)

Progressive Insurance retained Jonathan Costa, an "automotive fire investigator and mechanical expert," to "try to determine the origin and the cause of the fire." (*Id.* ¶¶ 86-87 (citing Ex. 20 at 25:8- 20, 36:10-16, 49:20-50:4.)) Following his investigation, Costa concluded that "the actual ignition source of the cause of the fire was undetermined," however, "burn patterns" and "component damage variables incurred to the [V]ehicle would indicate that the fire extended into the front of the [V]ehicle." (*Id.* ¶ 89 (citing Ex. 20, at 66:7-17.)) Costa testified that he concluded the fire "did not start in the [V]ehicle" because the burn patterns on the Vehicle were "not consistent with the fire originating within the vehicle." (*Id.* ¶ 90 (citing Ex. 20, at 67:3-8, 86:7-87:12.))

### C. **Plaintiffs' Expert**[5]

Plaintiffs retained and designated their expert, Nicholas Palumbo, as a person having "knowledge of the cause and origin of the fire." (*Id.* ¶ 91.) Palumbo is a recently retired fire investigator and a former fireman who holds "a bachelor's degree in fire and emergency service management and a master's [in] fire and emergency service administration." (*Id.* ¶¶ 92-93.) He also holds a certification as a fire and explosions investigator. (*Id.* ¶ 94.) During his time as an investigator, "[w]ell over 90 percent of [Palumbo's] work was fire and explosions investigations for attorneys and insurance carriers." (*Id.* ¶ 95.) Palumbo is not certified specifically for fire investigations involving vehicles, though he acknowledged that he is aware such certifications exist. (*Id.* ¶ 96.) It is undisputed that Palumbo does not have a degree or any training in engineering, including mechanical, electrical, and automotive engineering, he has never worked for a vehicle

---

[5] Defendant also retained two experts, James Mahaney and James Engle, to determine the origin and cause of the fire. (SUMF ¶¶ 142, 169.) Because Plaintiffs dispute the testimony of Defendant's experts, and the Court is required to view the facts in the light most favorable to the non-moving party, the Court does not rely on the testimony of Defendant's experts in deciding the instant motions. (*See* RSUMF ¶¶ 142-185.)

manufacturer, he has no experience in designing automobiles or designing, testing, or inspecting component parts of automobiles, and he has never been designated or testified as an expert in either mechanical or automotive engineering. (*Id.* ¶ 97.)

When Palumbo was contacted to work on this case, he was asked "[t]o determine what caused the fire." (*Id.* ¶ 98.) Like the other investigators mentioned above, Palumbo is familiar with NFPA 921 and called it "a guide [for] fire and explosions investigations," and agreed that it is the generally accepted methodology within the field of fire investigations. (*Id.* ¶ 101.) In his testimony, Palumbo estimated that likely more than 50% of fires result in the cause being undetermined. (*Id.* ¶ 105.) Palumbo also testified that the data of other investigators who inspect the evidence and who have expertise in areas beyond his own is relevant to the determination and the origin and cause of a fire and that "[i]f you're not an expert in a given field, referring to other experts who are experts in that field would be a good thing." (*Id.* ¶¶ 108-09.)

It is Palumbo's opinion that, while "the cause of the fire cannot be determined, . . . the cause of the fire being a malfunction in the 2018 Maserati GranTurismo cannot be ruled out[,]" and "that the origin of the fire was in the engine compartment of the 2018 Maserati GranTurismo vehicle." (*Id.* ¶ 110.) To support his opinion, Palumbo stated that "[t]he hood was consumed" and there was "heavy damage to the interior of the engine compartment." (*Id.* ¶ 112.) Because the hood of the Vehicle was consumed, Palumbo opined that "there had to be a fire within the engine compartment, and it had to burn for a while." (*Id.* ¶ 113.) When asked about burn patterns to the engine compartment specifically, Palumbo stated only that the "[h]eaviest burn [was] in the front of the engine compartment versus the rear of the compartment." (*Id.* ¶ 114.)

Palumbo observed extensive fire damage in the engine compartment of the Maserati and that the hood of the Vehicle was completely consumed by fire. (Plaintiffs' Counter-Statement of

Undisputed Material Facts ("CSUMF") ¶ 18.) Palumbo explained in his report why this is relevant: "In contrast, the other areas of the Maserati vehicle showed significantly less fire damage than the engine compartment and the hood. In addition, the debris I inspected did not indicate anything that would have started the fire. Likewise, my inspection of the garage and surrounding area did not indicate anything that would have started a fire." (*Id.* at ¶ 18 (quoting Ex. 23 at 5.)) Moreover, Palumbo eliminated the Vehicle's trunk as the fire's origin due to "the lack of fire damage," yet the trunk cover, like the hood, was also consumed in the fire—"[i]t was gone." (SUMF ¶ 119.) Palumbo concluded that "it is more likely than not that the fire originated in the engine compartment of the Maserati." (CSUMF ¶ 18.)

When he authored his report, Palumbo reviewed the Voorhees Fire Department NFIRS Report, the Camden County Fire Marshal's Office Fire Investigation Report, photographs from the Property and Vehicle inspections, and his observations from those inspections. (SUMF ¶ 126.) Palumbo reviewed only these materials because they were the only ones provided to him, and he did not request any other materials to review. (*Id.* ¶ 127.) He did not speak with any of the Property's residents, and he admitted that he was unaware that the residents had been deposed. (*Id.* ¶ 128.) As a result, Palumbo believed that the Vehicle was used the afternoon of the fire, and he did not know that Maxey testified that the Vehicle had not been driven in months, or that McKay testified that it had not been driven in at least two days at the time of the fire, which Palumbo admitted "might be" relevant to his opinions. (*Id.* ¶ 129.)

Palumbo testified that he ruled out several potential causes of the fire external to the vehicle. (CSUMF ¶ 28.) Palumbo explained that he ruled out an extension cord and electric receptacle, which only revealed signs of fire exposure damage. (CSUMF ¶ 28 (citing Ex. 22 at 65:12-17, 94:11-14.)) When asked about the possibility that the fire originated from outside the

Vehicle and then burned the hood from the outside, Palumbo testified that "for the hood to be that consumed, there had to be a fire within the engine compartment, and it had to burn for a while. Heat rises up and out. Something outside trying to get in would be a little more difficult." (*Id.* ¶ 28 (citing Ex. 22 at 70:14-20.)) When asked if the fire had originated in the engine compartment, whether it would have burned until all of the combustible material in the compartment was consumed, Palumbo also answered "[y]es." (SUMF ¶ 121.) However, Palumbo acknowledged that some combustible materials still remained in the engine compartment, and that the remaining combustibles could support a hypothesis that the fire originated external to the engine compartment of the Vehicle. (*Id.* ¶ 122.)

Within the Vehicle, Palumbo opined that he was able to eliminate the trunk as the origin of the fire due to the "lack of fire damage," testifying that although the trunk was destroyed, the truck cover was made of fiberglass and therefore, burned easier than metal. (CSUMF ¶ 31 (citing Ex. 22 at 83-84.)) Though not specifically mentioned in his report, Palumbo also testified that he looked at the fans of the engine to see if their motors were still viable. (CSUMF ¶ 35 (citing Ex. 22 at 121:8-12.)) Palumbo stated that, "If they didn't rotate, it would indicate possible heat source inside the fan itself." (*Id.*) Palumbo claimed that he was able to rule out the engine fan as the cause of the fire. (*Id.* (citing Ex. 22 at 121:13-15.)) Palumbo further testified that he was unable to rule out any electrical activity in the engine compartment as the potential cause of the fire. (*Id.* ¶ 35.)

While Palumbo stated that his experience investigating "vehicle fires in cars, trucks, buses, things of that nature" qualified him to opine that the fire *originated* in the engine compartment, (RSUMF ¶ 130 (citing Ex. 22 at 129:9-131:25)), Palumbo admitted that he does not have the

requisite expertise to opine as to the *cause* of fires involving vehicles.[6] (SUMF ¶ 130 (citing Ex. 22 at 123:21-24) (emphasis added.)) Palumbo worked on this case with Mike Zazula, an automotive engineer who was brought in to assist him due to Zazula's specific expertise regarding vehicle fires. (*Id.* ¶ 131.) According to Palumbo, Zazula told him that he could not provide an opinion regarding the cause of the fire. (*Id.* ¶ 133.) Plaintiffs did not designate Zazula as an expert in this case. (*Id.* ¶ 134.) Palumbo testified that he does not have an opinion as to the cause of the fire, any potential design or manufacturing defect in the Vehicle, and that he does not have the required expertise to offer such an opinion. (*Id.* ¶ 141 (citing Ex. 22 at 98:5-99:6.)) When asked if he had an opinion as to the cause of the fire, Palumbo stated, "[t]he actual cause, no." (RSUMF ¶ 141(citing SUMF Ex. 22 at 98:5-7.)) Palumbo's report only opines that "the cause of the fire being a malfunction of the 2018 Maserati Gran Turismo cannot be ruled out." (*Id.* (quoting Ex. 22 at 98:5-7.)) The report further states that it is Palumbo's "opinion within a reasonable degree of scientific certainty that the most likely area of origin of the fire was in the engine compartment." (*Id.*)

## III.   LEGAL STANDARD

### A.  Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by &*

---

[6] While Plaintiffs deny SUMF ¶ 130 "as stated," the portions of the record Plaintiffs cite to support their denial states only that Palumbo has investigated vehicle fires, which does not create a genuine dispute of the fact that Palumbo, by his own admission, lacks "the requisite expertise to opine as to the cause of fires involving vehicles." (RSUMF ¶ 130.)

through *Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Quincy Mut. Fire Ins. Co. v. Scripto USA*, 573 F. Supp. 2d 875, 878 (D.N.J. 2008) (quoting *Liberty Lobby*, 477 U.S. at 250).

## IV.  **DISCUSSION**

### A. Motion to Exclude Plaintiff's Expert

Defendant argues that the Court must exclude the testimony of Plaintiff's purported expert,

Nicholas Palumbo, on the basis that it lacks reliability and fit as required under *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence.

Rule 702 states as follows:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if the proponent demonstrates to the court that
> it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine
> a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and
> (d) the expert's opinion reflects a reliable application of the
> principles and methods to the facts of the case.

Fed. R. Evid. 702

Trial judges are charged "with the responsibility of acting as 'gatekeepers' to exclude unreliable

expert testimony[.]" *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 320-21 (3d Cir. 2003)

(citing *Daubert*, 509 U.S. at 597).

"Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability

and fit." *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations

omitted). First, "[q]ualification refers to the requirement that the witness possess specialized

expertise." *Id.* Courts "have interpreted this requirement liberally, holding that 'a broad range of

knowledge, skills, and training qualify an expert.'" *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*,

35 F.3d 717, 741 (3d Cir. 1994)). Second, an expert's proffered "testimony must be reliable; it

12

must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Id.* (citations and internal quotations omitted). Third, "the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Id.* The party seeking to present expert testimony must establish that the pertinent admissibility requirements are met "by a preponderance of" the evidence. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert*, 509 U.S. at 593, n.10).[7]

Here, Plaintiffs' sole expert, Palumbo, offers an opinion as to where the fire originated, *i.e.*, the engine compartment of the vehicle. (RSUMF ¶ 141.) But it is undisputed that Palumbo is not qualified to opine as to whether a defect existed in the Vehicle. (*See* SUMF at ¶¶ 130, 141; RSUMF ¶¶ 130, 141.) In forming his opinion as to where the fire originated, Palumbo opines that several potential heat sources external to the vehicle can be ruled out as the cause for the fire. (CSUMF ¶ 27.) Yet Palumbo offers no opinion as to the potential cause of the fire within the engine compartment, such as whether it was caused by poor maintenance or a defect that existed while the Vehicle was in Defendant's control. (*See* SUMF at ¶ 141; RSUMF ¶ 141; *see also* ECF No. 39-4 – Palumbo's Report.) Instead, the best Palumbo can offer is that an unidentified malfunction in the engine cannot be ruled out as the potential cause of the fire. (RSUMF ¶ 141.)

By his own admission, Palumbo does not have the requisite expertise to opine as to the *cause* of fires involving vehicles. (SUMF ¶ 130 (citing Ex. 22 at 123:21-24); *see Schneider ex rel. Est. of Schneider*, 320 F.3d at 404. Nor does Palumbo have a degree or any training in mechanical, electrical, and automotive engineering, or experience in designing automobiles or designing,

---

[7] The most recent amendments to Fed. R. Evid. 702 "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702, *Advisory Committee Notes on 2003 Amendments*.

testing, or inspecting component parts of automobiles. (SUMF ¶ 97.) He has never been designated or testified as an expert in either mechanical or automotive engineering. (*Id.*)

Accordingly, the Court finds that Palumbo's testimony and the portions of his report concerning potential causes of the fire within the engine compartment must be excluded because they lack the "qualification, reliability and fit" that Rule 702 requires. *See Schneider ex rel. Est. of Schneider*, 320 F.3d at 404. The Court need not analyze whether Plaintiffs' expert opinion as to the fire's origin must be excluded.[8] Even if the Court—viewing the facts in the light most favorable to Plaintiffs—accepts that Palumbo's testimony that the fire *originated* in the engine is admissible, for the reasons that follow, the lack of admissible expert testimony regarding the *cause* of the fire within the complex instrumentality of the Vehicle and its engine is fatal to Plaintiffs' claims.

### B. Motion for Summary Judgment

#### i. New Jersey Product Liability Act

Plaintiffs allege three causes of action pursuant to the New Jersey Product Liability Act ("PLA"), N.J.S.A. §2A:58C *et seq.*, including claims for design defect (Count I), manufacturing defect (Count II), and failure to warn (Count III).[9] (Compl., ECF No. 1.)

The PLA is the singular path to prosecute a product liability action against a manufacturer or seller for any harm caused by a product "irrespective of the theory underlying the claim," except under breach of express warranty. *See Kemly v. Werner Co.*, 151 F. Supp. 3d 496, 504 (D.N.J. 2015). "Three causes of action are established under the PLA, namely, claims for design defect,

---

[8] The Court acknowledges Palumbo's wealth of experience with respect to fire investigations. (*See, e.g.*, RSUMF ¶¶ 1-14.) The Court finds that it is unnecessary to analyze here whether Palumbo's opinion that the fire originated in the engine compartment is admissible because the Court finds that Palumbo lacks the experience necessary to guide the factfinder in determining whether a defect in the Vehicle caused the fire, which is essential for Plaintiffs to prevail on their PLA claims, (*see* SUMF at ¶¶ 130, 141; RSUMF ¶¶ 130, 141).

[9] In their Opposition, Plaintiffs concede their failure to warn claim. (Pls.' MSJ Opp. at 8.) Accordingly, the Court will grant summary judgment as to Count III.

14

manufacturing defect, or warnings defect." *Mendez v. Shah*, 28 F. Supp. 3d 282, 296 (D.N.J. 2014) (citations omitted). "The standard of liability is that the product 'was not reasonably fit, suitable or safe for its intended purpose.'" *Id.* (quoting *Cornett v. Johnson & Johnson*, 414 N.J. Super 365, 397 (App. Div. 2010)). The PLA states:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

> N.J.S.A. 2A:58C-2.

"A prerequisite of any recovery under strict tort liability is the existence of a defective condition." *Quincy Mut. Fire Ins. Co.*, 573 F. Supp. 2d at 879 (quoting *Zaza v. Marquess & Nell*, 144 N.J. 34, 49 (1996)). Thus, "[t]o prove a defect, a plaintiff must be able to show that: (1) the product was defective; (2) the defect existed when the product left the hands of the defendant; and (3) the defect caused the injury to a reasonably foreseeable user." *Mendez*, 28 F. Supp. 3d. at 296 (citations omitted). To succeed on a design defect claim, "a plaintiff must prove either that the product's risk outweighs its utility or that the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm." *Schweiger v. Standard Tile Supply, Co.*, No. A-1322-18T2, 2019 N.J. Super. Unpub. LEXIS 2268, *6 (App. Div. Nov. 6, 2019) (citing *Lewis v. Am. Cyanamid Co.*, 155 N.J. 544, 569 (1998)). To succeed on a manufacturing defect claim, "a plaintiff must prove that the product was not manufactured according to its design specifications." *Toms v. J.C. Penney Co.*, 304 F. App'x 121, 125 (3d Cir. 2008) (quoting *Myrlak v. Port Auth. of N.Y. & N.J.*, 157 N.J. 84, 96-97 (1999)).

Courts have repeatedly held that where a PLA cause of action "involves a complex instrumentality, expert testimony is needed in order to help the fact-finder understand 'the mechanical intricacies of the instrumentality' and help to exclude other possible causes of the accident." *Rocco v. New Jersey Transit Rail Operations, Inc.*, 330 N.J. Super 320, 341 (App. Div. 2000) (quoting *Jimenez v. GNOC Corp.*, 286 N.J. Super 533, 546 (App. Div. 1996)). It is well-settled that vehicles are complex instrumentalities. *See, e.g., Maison v. NJ Transit Corp.*, 460 N.J. Super. 222, 233 (App. Div. 2019) ("This case does not involve a complex instrumentality such as a car."); *Coba v. Ford Motor Co.*, No. 12-1622 (KM) (MAH), 2017 U.S. Dist. LEXIS 123546, at *24 (D.N.J. Aug. 4, 2017) ("Vehicles, like the Ford Super Duty trucks, are 'complex instrumentalities.'").

Ultimately, "determinations of cause and effect in vehicle fires" are "presumably normally made by experts in the field." *Snodgrass v. Ford Motor Co.*, No. CIV.A. 96-1814 (JBS), 2002 U.S. Dist. LEXIS 13421, at *41 (D.N.J. Mar. 28, 2002). Therefore, "[w]here the cause of an injury is arguably complex, a party must produce expert testimony on causation to survive a motion for summary judgment. Absent expert testimony, a reasonable jury cannot find from the evidence adduced that a manufacturing defect . . . caused the fire at issue." *Ford v. Ford Motor Co.*, 311 F. Supp. 3d 667, 680-81 (D.N.J. 2017). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial[.]" *Quincy Mut. Fire Ins. Co.*, 573 F. Supp. 2d at 879 (quoting *Celotex Corp*, 477 U.S. at 322-23).

### 1. Direct Evidence of a Design Defect

Defendant argues that Plaintiffs have failed to adequately allege a claim for design defect because they have not advanced an alternative design for the Vehicle. (Def.'s Motion for Summary Judgment ("MSJ") Br. at 5, ECF No. 41-1.) While "there is no 'per se rule that Plaintiffs must,

under all circumstances, provide a reasonable alternative design,' a plaintiff must plead either that the product's risk outweighs its harm, or that an alternative design exists, in order to state a claim for a design defect" under the PLA. *Mendez*, 28 F. Supp. 3d. at 297- 98 (quoting *Schraeder v. Demilec* (USA) LLC, No. 12-6074 (FSH), 2013 U.S. Dist. LEXIS 151995, at *7 (D.N.J. Oct. 22, 2013)). Here, though Plaintiffs have not plead the existence of an alternative design, Plaintiffs have plead that the risk of harm outweighs the benefits. (*See* Compl. ¶¶ 22-26.) The Court finds, however, that even assuming the fire originated in the engine compartment, without any admissible expert testimony concerning the potential cause of the fire or the existence of any potential defect within the engine compartment, Plaintiffs cannot prove the essential element of causation by direct evidence with respect to their claim for defective design as a matter of law.

In *Quincy*, the plaintiffs brought suit under the PLA against a manufacturer of a utility lighter, alleging that a defect with the lighter caused a fire that damaged their home. *Quincy Mut. Fire Ins. Co.*, 573 F. Supp. 2d at 876. The plaintiffs' sole expert had no formal engineering education and was unable to offer any opinion as to the existence of a design defect. *Id.* at 876-78. The court noted that, "[a]lthough this Court must view the facts in the light most favorable to Plaintiff, Plaintiff cannot shirk its duty to present or point to evidence supportive of claims on which it has the burden of proof. Plaintiff has come forward with no evidence of two essential elements of its claim: (1) that a defect existed and (2) that the defect caused the injury." *Id.* at 880. Thus, the Court held that, "[a]bsent any evidence of defect or causation, the Court must grant judgment as a matter of law at this stage. Proving a defect in the product is a necessary component of Plaintiff's prima facie case, as is proving causation." *Id.*

In *New Jersey Mfrs. Ins. Grp. v. Hearth & Home Techs.*, the plaintiffs brought a PLA claim against the manufacturer of a gas fireplace, alleging a defect caused a fire that damaged their

property. Civ. No. 08-4995, 2010 WL 3943725, at *1 (D.N.J. Oct. 6, 2010) ("*Hearth*"). The plaintiffs proffered an expert witness whose testimony merely "suggest[ed] that the fire originated from the firebox," but did not "address[] the cause of the fire shooting out of the firebox." *Id.* at *6-8 (finding the expert's testimony could not "aid the jury in determining what caused the fire to spew out."). The Court reasoned that:

> For a jury to conclude that the cause of the fire's spewing was due to an internal defect, it would have to comprehend electrical engineering principles of heat transfer and combustion, *inter alia.* In other words, while the purpose of the Heat & Glo unit can be understood by the average layperson, a jury could not readily ascertain what caused this device to act in a fashion that did not comport with its intended function.
>
> Furthermore, even if the jury could draw the inference that fire shooting out of the firebox is the kind of incident that ordinarily occurs as the result of a product defect, expert testimony does assist the jury in considering other possible causes of the fire.

> *Id.* at *8.

As a result of the plaintiffs' failure to offer expert testimony to guide the factfinder in ruling out potential technical causes of the fire not attributable to a product defect, the court granted summary judgment in favor of defendants. *Id.* at *8-9.

Similarly, here, Plaintiffs' sole expert opines that the fire originated in the engine compartment but concedes that he lacks the requisite experience to opine on the cause of vehicle fires and any alleged defect within the Vehicle that may have caused the fire. (SUMF ¶¶ 130, 141); *see Quincy*, 573 F. Supp. 2d at 879; *Hearth*, 2010 WL 3943725, at *8-9. As the case law makes clear, a vehicle engine is a complex instrumentality which requires expert testimony to guide the factfinder in determining whether the fire was caused by a defect or, for example, poor maintenance or damage that occurred after the vehicle left the manufacturer's control. *See Ford*, 311 F. Supp. 3d at 680-81; *see also Kuhar v. Petzl Co.*, No. 19-3900, 2022 WL 1101580, at *3 (3d

Cir. Apr. 13, 2022) (expert testimony is required where, as here, the factfinder must employ "scientific, technical, or other specialized knowledge."). Without such expert testimony on causation, Plaintiffs cannot prove an essential element of their claim for design defect, rendering immaterial any remaining factual disputes with respect to this cause of action.

### 2. Direct Evidence of Manufacturing Defect

"To establish the presence of a manufacturing defect, a plaintiff is required to demonstrate, in a general sense and as understood by a layman, that something was wrong with the product." *Worrell v. Elliott & Frantz*, 799 F. Supp. 2d 343, 351 (D.N.J. 2011). "A product is deemed to be defective if it is not reasonably fit, suitable, or safe for the ordinary or foreseeable purpose for which it is sold." *Myrlack*, 157 N.J. at 97. "To determine whether a product contains a manufacturing defect, the 'product may be measured against the same product as manufactured according to the manufacturer's standards.'" *Id.* at 298 (citations omitted). A manufacturing defect exists "[i]f the particular product used by the plaintiff fails to conform to those standards or other units of the same kind[.]" *Id.* (citation omitted). "To prove both the existence of a defect and that the defect existed while the product was in the control of the manufacturer, a plaintiff may resort to direct evidence, such as the testimony of an expert who has examined the product." *Diaz v. Glock, Inc.*, No. 2:08-cv-0567, 2012 WL 13186916, at *3 (D.N.J. May 30, 2012).

Here, Plaintiffs do not present any evidence or even allege that the Vehicle was not manufactured according to Defendant's manufacturing standards. As a question requiring technical knowledge, the factfinder requires admissible expert testimony to determine whether the Vehicle failed to conform to the applicable standards and to identify a potential defect. *See Ford*, 311 F. Supp. 3d at 680-81; *Kuhar*, 2022 WL 1101580, at *3. Because Plaintiffs' only witness lacks the technical knowledge required to opine whether the "complex instrumentality" of the Vehicle's

engine was defective, and indeed has no opinion as to any potential manufacturing defect in the Vehicle, Plaintiffs cannot prove the essential elements of their manufacturing defect claim by direct evidence as a matter of law. *See Quincy*, 573 F. Supp. 2d at 879; *see also Diaz*, 2012 WL 13186916, at *3 (granting the defendants summary judgment because the plaintiff failed to identify that a manufacturing defect existed and failed to adduce evidence that such a defect caused the plaintiff's injury).

### 3. Alternative Methods of Proof for PLA Claims

Plaintiffs argue that, notwithstanding their lack of expert testimony on the purported cause of the fire within the engine compartment, they may rely on three alternative methods of proof to succeed on their PLA claims: (1) circumstantial evidence of a product defect; (2) evidence to negate other possible causes of the fire; and (3) the indeterminate product defect test. (Pls.' MSJ Opp. at 8-10.)

#### a. *Circumstantial Evidence of a Product Defect*

In some circumstances, a plaintiff may produce circumstantial evidence of a defect. Circumstantial evidence, in contrast to direct evidence, "can be acceptable when a plaintiff shows that an accident occurred plus 'proof of proper use, handling[,] or operation of the product[,] and the nature of the malfunction . . . .'" *Kuhar*, 2022 WL 1101580, at *3 (quoting *Scanlon v. Gen. Motors Corp., Chevrolet Motor Div.*, 65 N.J. 582, 591 (1974)). "But, where a factfinder must employ 'scientific, technical, or other specialized knowledge' use of expert testimony is required.'" *Id.* (citing *Scanlon*, 65 N.J. at 591). The Supreme Court of New Jersey held in *Myrlak*:

> The age and prior use of the product in relation to its expected life span are factors to consider in conjunction with other evidence presented . . . . However, age of the product alone may not preclude a finding that the product was defective when the product is "of a type permitting the jury, after weighing all the evidence . . ., to infer that in the normal course of human experience an injury would not

20

have occurred at this point in the product's life span had there not been a defect attributable to the manufacturer.

*Myrlak*, 157 N.J. at 98-99 (quoting *Scanlon*, 65 N.J. at 593) (internal citations omitted).

In *Scanlon*, even though the plaintiff proffered evidence that his vehicle "malfunctioned violently while properly being operated," the Court held that the "critical inference [that a design or manufacturing defect existed] could not be drawn" because while the evidence suggested that "the vehicle was defective at the time of the accident," the plaintiff failed to show that the vehicle was defective while in control of the manufacturer. *Id.* at 598-99. The Court reasoned that:

> a motor vehicle is not a simple uncomplicated instrumentality. Its parts require periodic maintenance, minor adjustments and occasional major repairs or replacements. A nine-month old station wagon with 4000 miles on it is not the kind of product as to which human experience tells us an accident such as the one in question does not generally occur in the absence of a defect existing in the hands of the manufacturer.

*Scanlon*, 65 N.J. at 599.

Therefore, despite circumstantial evidence that could suggest the vehicle was defective at the time of the accident, the Court held "that in the circumstances of this case the 'other evidence' offered does not justify the drawing of an inference that any defect existed in the hands of the manufacturer or retailer." *Id.*

For this reason, even when attempting to prove a product defect through the use of circumstantial evidence, expert testimony is required in a case involving a complex instrumentality, as here. *See Kuhar*, 2022 WL 1101580, at *3; *see also State Farm Fire & Cas. Co. v. Kaz, Inc.*, No. A-6587- 06T1, 2008 N.J. Super. Unpub. LEXIS 193, at *10-11 (Super. Ct. App. Div. May 22, 2008) (citations omitted) ("A plaintiff may prove the existence of a product defect by relying on the testimony of an expert or alternatively, a plaintiff may proffer

circumstantial evidence of a defect, including use, handling, and operation of the product. . . .
Expert testimony is required, however, . . . [i]f 'the case involves a complex instrumentality.'").

Here, it is undisputed fact that Plaintiffs' sole expert has no opinion—and is not qualified
to render any opinion—regarding any design or manufacturing defect, let alone that such defect
existed before the Vehicle was sold. (SUMF at ¶ 141.) Accordingly, the Court finds that Plaintiffs
cannot rely on circumstantial evidence to survive summary judgment on their PLA claims.

### b. *Evidence to Negate Other Possible Causes of the Fire*

In certain circumstances a plaintiff may attempt to "negate other causes of the failure of
the product for which the defendant would not be responsible, in order to make it reasonable to
infer that a dangerous condition existed at the time the defendant had control" of the product.
*Scanlon*, 65 N.J. at 593-94 (citing *Jakubowski v. Minnesota Min. & Mfg.*, 42 N.J. 177, 184 (1964)).
"Under that approach, a plaintiff does not have to negate all possible causes of failure, only those
likely causes of failure." *Myrlak*, 157 N.J. at 99 (citing *Scanlon*, 65 N.J. at 594). Because the
Vehicle is a complex instrumentality, Plaintiffs must provide expert testimony to negate other
likely causes of a fire within the engine compartment that are not attributable to a design or
manufacturing defect which occurred while in the Defendant's control. *See Kuhar*, 2022 WL
1101580, at *3-5 (holding that "the District Court properly concluded that expert testimony was
required" to prove the "nature of the malfunction" resulted from a product defect using
circumstantial evidence where such finding "depends on scientific, technical, or other specialized
knowledge."); *see also Scanlon*, 65 N.J 594 ("Depending upon the complexity of the product, this
type of proof may require the testimony of an expert witness as to the various possible explanations
for the mishap."); *Coba*, 2017 U.S. Dist. LEXIS 123546, at *24 ("Vehicles, like the Ford Super
Duty trucks, are 'complex instrumentalities.'").

Here, while Palumbo purports to have ruled out causes of the fire *external* to the Vehicle, Palumbo offers no opinion to rule out any potential cause of the fire *within* the Vehicle and its engine compartment, such as whether it was caused by poor maintenance or a product defect. (*See* SUMF at ¶ 141; RSUMF ¶ 141; ECF No. 39-4.) This is not enough to support an alternative method of proof based on the negation of other viable causes sufficient to survive summary judgment. Even if the Court were to accept that the fire originated in the engine compartment, Plaintiffs offer no competent expert testimony to support their speculation that the fire was likely caused by a design or manufacturing defect, as opposed to a malfunction resulting from poor maintenance, damage, or some other cause. *See Kuhar*, 2022 WL 1101580, at *3-5; *Scanlon*, 65 N.J 594; *Coba*, 2017 U.S. Dist. LEXIS 123546, at *24.

Accordingly, the Court finds that Plaintiffs have failed to adduce the requisite expert testimony to negate other likely causes of the fire not attributable to a design or manufacturing defect sufficient to prevail on their PLA claims.

### c.  *The Indeterminate Product Defect Test*

"Although a traditional *res ipsa loquitor* jury charge cannot be used in a strict products liability case, the Supreme Court of New Jersey has made available an indeterminate product defect test in its stead." *Kuhar*, 2022 WL 1101580, at *5 (citing *Myrlak*, 157 N.J. at 90). Under this test, "[a] plaintiff may . . . rely on an inference that a product is defective where the incident that harmed the plaintiff was (1) of a kind that ordinarily occurs as a result of a product defect; and (2) was not, in the particular case, solely the result of causes other than a product defect existing at the time of sale or distribution." *Toms*, 304 Fed. App'x at 125 n.2 (citations omitted). This test "is infrequently applied to cases involving fires." *Ford*, 311 F. Supp. 3d at 681 n.12 (quoting *Menth v. Breeze Corp.*, 4 N.J. 428, 435 (1950)) (emphasis added).

As the Supreme Court of New Jersey explained long ago, the reason for not applying *res ipsa loquitor* (and by extension, the analogous indeterminate product defect test) with respect to fires is because "[t]he cause of a fire is generally unknown, fires commonly occur where due care has been exercised as well as where due care was wanting." *Menth*, 4 N.J. at 435. Rather, the general rule is that "the destruction of property by fire, either on premises where it starts, or upon other property to which it is communicated, does not of itself raise a presumption of negligence in either the kindling or management of the fire unless there are special circumstances present that lead to a reasonable conclusion that due care was wanting." *Id.*

In *Ford*, the court held that the indeterminate product defect test could not be applied in a case involving a fire in a garage with a vehicle parked inside. *Ford*, 311 F. Supp. 3d at 681 n.12. The Court reasoned that it was "not a case where a malfunctioning product bespeaks negligence." *Id.* Such an "inference of defectiveness" would arise, for example, in a situation in which a vehicle "suddenly and spontaneously accelerated without driver input." *Id.* (citation omitted).

Moreover, even where the indeterminate product defect test is appropriate, expert testimony is required when the issue to be determined, as here, "falls outside the common knowledge of the fact finder and depends on scientific, technical, or other specialized knowledge." *Kuhar*, 2022 WL 1101580, at *5 (quoting *Jerista v. Murray*, 185 N.J. 175, 199 (2005)). In *Kuhar*, the Third Circuit held that the plaintiff's indeterminate product defect theory failed and the defendant was entitled to summary judgment because the plaintiff had no expert testimony "to determine whether the device [at issue] was defective and caused the harm alleged." *Id.*

In *Hearth*, this Court granted summary judgment to a defendant in a case in which there was no expert testimony to establish the cause of a fire, and therefore the plaintiff could not rely on the indeterminate product defect test. 2010 WL 3943725, at *1. The plaintiff's expert, as here,

conceded that its "testimony was limited to the origin of the fire, . . . and agreed that he was not qualified to testify as to whether a product defect within the fireplace caused the fire." *Id.* at *9. As a result, even though the expert's "testimony suggested that the fire originated from the firebox," it did not address "the causes of the fire shooting out of the firebox." *Id.* at *17-18.

Similarly, here, there is no dispute that Plaintiffs' sole expert has not and cannot opine as to the cause of the fire within the Vehicle or any alleged defect with the Vehicle that may have caused the fire. (*See* ECF 39 at ¶¶ 130, 141.) It is also undisputed that the question of whether an alleged defect in the Vehicle caused the fire is beyond the common knowledge of a juror. Thus, without any admissible expert testimony concerning the cause of the fire within the Vehicle, even assuming it originated within the engine compartment as Palumbo contends, Plaintiffs cannot rely on the indeterminate product defect test to prove their PLA claims.

Accordingly, the Court finds that here, the indeterminate product defect test is inapplicable as an alternative method of proof due to Plaintiffs' lack of competent evidence regarding causation.

### ii. Negligence

Finally, Plaintiffs argue that even if their PLA claims fail, their case must proceed to trial on its cause of action for negligence. "The PLA 'established the sole method to prosecute a product liability action' such that 'only a single product liability action remains.'" *Clements v. Sanofi Aventis, U.S., Inc.*, 111 F. Supp. 3d 586, 596 (D.N.J. 2015) (quoting *Tirrell v. Navistar Int'l, Inc.*, 248 N.J. Super 390, 398-99 (App. Div. 1991)). Thus, "former common-law causes of action [such as negligence] have merged into a single cause of action under the PLA." *Id.*

"This is not to say that the PLA subsumes all causes of action involving a 'harm' caused by a 'product.'" *Worrell*, 799 F. Supp. 2d at 351 (quoting *New Hope Pipe Liners, LLC v. Composites One, LCC*, No. 09–3222, 2009 WL 4282644, at *2 (D.N.J. Nov. 30, 2009)). "To

determine whether the PLA subsumes a particular claim, courts examine the essential nature of the claim presented and decide whether the claim would traditionally be considered a products claim." *Rodnite v. Hovnanian Enters., Inc.,* No. 08–3787, 2010 WL 3079576, at *3 (D.N.J. Aug. 5, 2010). "A negligence claim predicating liability on a breach of duty arising independent of the manufacturer's duty to provide a non-defective product would not be considered a product liability action even if the harm was caused by the product." *Worrell,* 799 F. Supp. 2d at 351.

Here, Plaintiffs' fourth cause of action alleges that Defendant "negligently manufactured the Maserati Vehicle, which caused the fire and ultimately caused damage to the Property." (Compl. ¶ 39.) This is precisely the type of negligence claim that is subsumed by the PLA. *See Worrell,* 799 F. Supp. 2d at 351; *Clements,* 111 F. Supp. 3d at 596. Because "New Jersey no longer recognizes breach of implied warranty, negligence, and strict liability as viable separate claims for harm deriving from a defective product[,]" Plaintiffs' negligence claim cannot survive summary judgment as a matter of law. *Clements,* 111 F. Supp. 3d at 596-97.

## V.    CONCLUSION

For all the foregoing reasons, Defendant's Motion to Exclude (ECF No. 40) is **GRANTED** in part, and Defendant's Motion for Summary Judgment (ECF No. 41) is **GRANTED**. An order consistent with this Opinion will be entered.

March 31 , 2025

KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE